## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO.: _____

FUNDING METRICS, LLC

      Plaintiff,

vs.

DECISION ONE DEBT RELIEF LLC; D1
SERVICING GROUP, LLC; VERITAS LEGAL
PLAN, INC.; ANGELO ANZALONE; SARA
ANZALONE; CHRIS CARROLL; VICTOR
CASTALDO; MARIO CHAVOYO; RAYMOND
CIERVO; MATTHEW FRANK; JESSE ROSS;
REY RUIZ; JOHN SANDOVAL; STEVEN
SCORSONE; DWAYNE SMITH; JOHN
ZINICOLA;

      Defendants.

_____/

## COMPLAINT

Plaintiff Funding Metrics, LLC ("Funding Metrics"), by its undersigned attorneys,

alleges as follows:

## INTRODUCTION

1.      In this civil action, Plaintiff seeks monetary and injunctive relief for violations of

the Racketeer Influenced and Corrupt Organizations Act ("RICO," 18 U.S.C. §§ 1961-1968) and

other tortious conduct by Defendants Decision One Debt Relief LLC ("Decision One"), D1

Servicing Group, LLC ("D1 Servicing"), Veritas Legal Plan, Inc. ("Veritas"), and several of their

respective managers and employees, including Angelo Anzalone, Sara Anzalone, Chris Carroll

("Carroll"), Victor Castaldo ("Castaldo"), Mario Chavoyo ("Chavoyo"), Raymond Ciervo

("Ciervo"), Matthew Frank ("Frank"), Jesse Ross ("Ross"), Rey Ruiz ("Ruiz"), John Sandoval

("Sandoval"), Steven Scorsone ("Scorsone"), Dwayne Smith ("Smith") and John Zinicola ("Zinicola") (collectively, "Defendants").[1]  Since at least 2016, Defendants have been conducting a nationwide illegal debt restructuring scheme through numerous acts of mail and wire fraud, causing financial injury to Plaintiff as well as many of Plaintiff's merchants who have been targets of Defendants' scheme.

2.      Plaintiff is in the business of purchasing the accounts receivable of merchants – commonly referred to as merchant cash advance funding – which serves as a critical source of financing for small businesses.  Defendant Decision One (along with its affiliate/alter ego D1 Servicing) fraudulently presents itself as being able to renegotiate and restructure merchant agreements with Plaintiff and other funding companies.  It has established a deceptive business practice of making misleading and often outright false representations to merchants under contract with Plaintiff promising that, with its help, these merchants will save money on those contracts by defaulting on them.  Decision One tells merchants that they can safely stop paying cash advance funding companies like Plaintiff; that it will go to work for them promptly; that it can reduce their debt by 60-80% or more; and that they will be provided with a Veritas insurance plan to cover legal expenses arising from their defaults, once cash advance companies exercise their rights under agreements with their merchants, as they inevitably will.  Based on these misrepresentations, the merchants default on their contracts with their funders – that is, at Decision One's direction, they stop paying their funders and instead pay Decision One – although Decision One does not even expect to achieve results for the merchants.  The result is a fraud on the merchants and tortious interference with the contracts Plaintiff have with them. Decision One also collects money from the merchants, drawing on accounts containing the

---

[1] Decision One, D1 Servicing, Carroll, Chavoyo, Ciervo, Frank, Ross, Ruiz, Sandoval, Scorsone, Smith, and Zinicola are sometimes referred to collectively as the "Decision One Defendants."

proceeds of inventory and receivables in which Plaintiff has perfected security interests, thereby converting Plaintiff's property.  The same collections divert funds payable to Plaintiff under judgments it obtains against the merchants, and thus are fraudulent transfers under the law of New York, the state where those judgments are entered.

3.     When merchants default based on Decision One's advice, their funders engage in debt collection.  The merchants turn to Decision One, looking for help, but instead they receive false and misleading information and advice from non-attorneys.  Decision One is not ready to do anything for them.  All it can do is offer a proposed settlement to the funder on the merchant's behalf, which they do not do, as it is not profitable to Decision One until the merchant has paid into its "debt relief" program for several months – a fact Decision One seldom if ever discloses when it is recruiting merchants with promises of immediate and effective action.

4.     Decision One engages in this course of deceptive conduct in combination with D1 Solutions and Veritas, the latter of which holds itself out as an insurance plan that will provide legal services to merchants if they are sued for debt collection.  The Veritas plan is an essential component of the package Decision One sells to merchants, as it enables Decision One to "assure" merchants that if they are sued for defaulting based on the bad legal advice Decision One's non-lawyer sales personnel give them, they will receive a defense.  However, Veritas often cannot lawfully deliver on its promises, because it is not licensed to sell insurance in Florida (its home state) and other relevant jurisdictions.  Indeed, Veritas entered into a consent order with the Florida Office of Insurance Regulation under which Veritas agreed not to sell legal expense insurance in Florida, yet it has continued to make such sales in Florida, to say nothing of other states where it lacks that authority, including California and Ohio.  By collecting fees from merchants signed up by Decision One, Veritas profits from Decision One's fraud on

the merchants, of which it is fully aware and which it enables.  In fact, the Veritas contract is sent to the merchants as part of the Decision One documents and has the Decision One logo stamped on it, and the first $1,500.00 Decision One collects from each merchant is paid to Veritas for its so-called "insurance."  Veritas knows exactly what it is doing: its President, Angelo Anzalone, who signed the consent order against Veritas, owned Active Debt Solutions, a debt relief company that targeted consumer debtors and operated out of the premises currently occupied by Veritas until it shut down after being investigated and/or fined by a number of state attorneys-general.

5.      If a merchant turns to Veritas for assistance during the inevitable debt collection process, Veritas will not provide a lawyer to guide the merchant through the legal problems raised by its default unless the merchant has actually been sued.  Even then, merchants may not receive a defense.  For example, recently merchants represented by Higbee & Associates ("Higbee"), a law firm Veritas hired for the merchants, were left without counsel in collection matters pending in New York when Higbee abruptly stopped representing them because its New York attorney did not have the in-state office required by statute for him to practice in that state. Higbee's roster of attorneys includes Katherine Sandoval, who is married to its founder, Mathew Higbee, and is also, on information and belief, a close relative of Decision One's Chief Executive Officer, John Sandoval; the predatory debt relief community is a small world.

6.      Decision One, John Sandoval, Veritas, and Angelo Anzalone form an association-in-fact enterprise (the "Decision One Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  Defendants have conducted the affairs of the Decision One Enterprise through a pattern of racketeering activity consisting of dozens of acts of mail and wire fraud since January 2017, involving 29 merchants in Florida, California, Texas, and at least ten other states.

Aside from injuring the merchants, who often receive nothing in exchange for the fees they pay Decision One and Veritas, Defendants' fraud proximately causes injury to Plaintiff's business and property, by inducing the merchants not to pay Plaintiff and diverting funds from merchants accounts, which Plaintiff owns. The same course of conduct by Defendants also constitutes a conspiracy under state law.

7.      Plaintiffs now seek damages for the torts Defendants have perpetrated in the past, and injunctive relief to prevent the continuation of such conduct in the future.

## PARTIES

8.      Plaintiff Funding Metrics is a Delaware limited liability company with its principal place of business in Langhorne, Pennsylvania.

9.      Defendant Decision One is an Oklahoma limited liability company with its principal place of business in Tulsa, Oklahoma.

10.     Defendant D1 Servicing is a New York limited liability company with its principal place of business in New York, New York.

11.     Defendant Veritas is a Florida corporation with its principal place of business in Boynton Beach, Florida.

12.     Defendant Angelo Anzalone is the founder and Managing Member of Veritas and a resident of Florida.

13.     Defendant Sara Anzalone, the wife of Angelo Anzalone, is the Chief Operating Officer of Veritas and a resident of Florida.

14.     Defendant Chris Carroll is a client relations employee of Decision One and a resident of California.

15.     Defendant Victor Castaldo is an employee of Veritas and a resident of Florida.

16.     Defendant Mario Chavoyo is a client relations employee of Decision One and a resident of Arizona.

17.     Defendant Raymond Ciervo is a client relations employee of Decision One and a resident of Florida.

18.     Defendant Matthew Frank is a client relations employee of Decision One.

19.     Defendant Jesse Ross is a client relations employee of Decision One.

20.     Defendant Rey Ruiz is a client relations employee of Decision One.

21.     Defendant John Sandoval is the founder and Chief Executive Officer of Decision One and a resident of California.

22.     Defendant Steven Scorsone is a client relations employee of Decision One and a resident of Illinois.

23.     Defendant Dwayne Smith is an employee of Veritas and a resident of Florida.

24.     Defendant John Zinicola is a client relations employee of Decision One and a resident of Florida.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as those claims are substantially related to the federal RICO claim and arise from a common nucleus of operative facts, and thus they form part of the same case or controversy under Article III of the United States Constitution.

26.     Venue is proper in this District and before this Court pursuant to 28 U.S.C. § 1391(b)(2) because events giving rise to Plaintiff's claims occurred in this District.  Venue is also proper under 18 U.S.C. § 1965(a) because Defendants transact their affairs in this District.

## FACTUAL BACKGROUND

A.      **The Merchant Cash Advance Business and Plaintiff's Agreements with Its Merchants**

27.      Plaintiff purchases accounts receivable from merchants (and Plaintiff along with other purchasers of such accounts is sometimes referred to herein as a "Merchant Cash Advance Provider").  Plaintiff's practice is to enter into merchant cash advance agreements with counterparty merchants (the "Merchant Cash Advance Agreements").  Such merchant cash advance funding provides a critical source of capital to small businesses.

28.      Under Plaintiff's Merchant Cash Advance Agreements, Plaintiff provides a fixed, up-front capital infusion to the merchant.  In exchange, the merchant sells to Plaintiff a percentage share of the merchant's future receivables, up to a fixed amount.  Each of the Merchant Cash Advance Agreements at issue here involved just such an initial capital infusion from Plaintiff to a merchant.  In exchange, the merchants sold to Plaintiff the ownership of a percentage of their monthly receivables (the "Specified Percentage"), typically in a range from 10-20 percent, to be collected until Plaintiff received a specified "Purchased Amount."

29.      Under the Merchant Cash Advance Agreements, Plaintiff obtained the right to automatically debit from the merchants' bank accounts the payments due to Plaintiff.  The amount debited was an agreed-upon approximation of the expected amount of receipts from the merchants' accounts receivable payable to Plaintiff, and the merchants retained the right in the event that the debits exceeded their actual receipts in a given month to "true up" the payment to reflect the actual receipts.  Instead of invoking the true up, some merchants, when faced with cash shortfalls, simply request an adjustment in their daily payment.  Plaintiff is often prepared to accommodate these requests or otherwise work with merchants who miss a payment for a good reason.  On the other hand, if a merchant cuts off Plaintiff's access to its bank account – as

Decision One advises – or directs customers to remit payments to a different account, such a merchant's intent to repudiate its Merchant Cash Advance Agreement is unmistakable.

30.     Concurrently with execution of each merchant agreement, Plaintiff and the merchants entered into security agreements (the "Security Agreements").  The Security Agreements secure the merchants' obligations under the Merchant Cash Advance Agreements by providing Plaintiff with a security interest in all assets owned, either currently or in the future, by the merchants, including their inventory, deposit accounts, accounts receivable, other assets, and the proceeds thereof.  The merchants agreed not to further encumber such collateral.  Each of the Merchant Cash Advance Agreements at issue here was accompanied by Security Agreements between Plaintiff and the merchant. Following execution of each security agreement, Plaintiff filed a UCC-1 financing statement to perfect its security interest in each merchant's assets.

31.     Plaintiff's Merchant Cash Advance Agreements provide that, in the event a merchant defaults, the "Specified Percentage" of its receivables payable to Plaintiff becomes 100 percent (as opposed to the smaller percentage applicable absent a default).  In other words, the merchants agreed, upon default, to assign to Plaintiff all of their receivables (up to the full "Purchased Amount" owed to Plaintiff), thereby accelerating Plaintiff's right to collect.  Plaintiff perfects the security interests in the merchants' receivables and the proceeds thereof.  When a merchant defaults, the increase of the Specified Percentage to 100 percent typically means that the funds in the merchant's bank accounts – which are the proceeds of the receivables – are payable to Plaintiff.  Indeed, those funds are Plaintiff's property because by this time the Purchased Amount usually exceeds the amount of funds in a merchant's bank account, so that all of the funds in such accounts become Plaintiff's property at the moment of a merchant's default. In contrast to the situation before a merchant defaults (when the merchant is still free to pay its

other obligations while satisfying its obligation to Plaintiff), after a breach, any transfer by a merchant from its account, other than to Plaintiff, is an appropriation of funds in which Plaintiff has a right superior to that of the merchant and any of its other creditors.

32.     Following execution of the Merchant Cash Advance Agreements and Security Agreements at issue here, Plaintiff performed its obligations by providing the funds due to each merchant at issue in this action.

33.     It is common in the industry, and it has been the experience of Plaintiff, that merchants seek to (and do) renew and/or seek additional Merchant Cash Advance Agreements from those with whom they enter into such agreements.  These renewals of Merchant Cash Advance Agreements, and making of new agreements with existing merchant customers, are an important source of revenue for Plaintiff.

**B.     Decision One's "Debt-Relief" Scheme**

34.     Decision One presents itself as being able to renegotiate and restructure Merchant Cash Advance Agreements for merchants with their Merchant Cash Advance Providers.  This is a variant of the "debt relief" schemes that have been sold to many consumer debtors in recent years.  But while regulators have shut down or curtailed many fraudulent debt relief operations targeting consumers, they have paid little attention to the same phenomenon in the commercial sector.

35.     Decision One identifies merchants under contract with Merchant Cash Advance Providers like (and including) Plaintiff.  Decision One identifies such merchants mainly via three avenues: mailers, cold calls, and online advertisements.

36.     The first avenue the Defendants utilize to obtain their victims begins with the purchase of UCC lists of merchants that have already obtained a Merchant Cash Advance and have a UCC-1 filed against them.  Defendants then proceed to contact the merchants on the lists;

one form of their attempts is to solicit them via mail advertisements promising to reduce their debt by high percentages.  Such mailers are littered with the notion that Defendants will be able to reduce the debt of a merchant by high percentages.  One such mailer was received by Plaintiff's merchant MFM, Inc., which, as discussed below, received a cash advance from the Plaintiff on August 16, 2017, and which, in October 2017, received a mailer from the Defendant. The mailer prompted the owners of MFM, Inc., Mark White and his wife Susan White, to reach out to Decision One and fall victim to their scheme.  In describing the mailer Mark White commented that "it was a post card … it looked official like something from the IRS."

37.     Once a merchant with a Merchant Cash Advance Agreement has been identified, an employee of Decision One then calls the merchant and advises that it can help the merchant reduce its obligations under its Merchant Cash Advance Agreement.

38.     These calls are highly deceptive.  First, merchants are encouraged to expect enormous reductions in their payment obligations (the Decision One website promises savings of up to 60-80%), when in fact Decision One cannot deliver such savings.  Decision One also promises to negotiate and "work with creditors to create new terms based on the amount you can reasonably afford each month, freeing up the natural cash flow," and claims that, using "a proven debt restructuring system alongside our bulk settlement process, we are able to provide you with significant relief of your business debts."  None of these promises is true.

39.     Second, from the very first call, Decision One representatives advise merchants to stop paying their Merchant Cash Advance Providers.  They also advise merchants to close the bank accounts from which the Merchant Cash Advance Providers are entitled to debit and open new accounts at a different bank, often under a different business name, and to start paying Decision One although there is no lawful basis to do so.  When they ask Decision One whether

there will be legal repercussions due to their stopping payment (or what to do when their Merchant Cash Advance Providers, inevitably, take legal measures against them), Decision One's non-lawyer personnel assure the merchants that the legal threats they face are unfounded and can be ignored, and there will be no negative legal ramifications.

40.     Decision One representatives even tell merchants to change their businesses' names in order to frustrate collection activity.  This, too, is legal advice (although not given by an attorney), with potentially far-reaching legal consequences for the merchants, and it is misleading and more likely to harm rather than help the merchant if followed.

41.     In a further disingenuous twist, Decision One includes language in its "Business Debt Resolution Agreement" stating that it has not advised the merchant to stop paying, but that language is directly contrary to the advice Decision One actually gives merchants.  In a similar deception, the Business Debt Resolution Agreement recites that Decision One does not provide legal representation.  However, the advice Decision One gives to stop paying, close bank accounts, change the name of the business and not communicate with Merchant Cash Advance Providers, is legal advice, and Decision One wants merchants to think so.  The emails Decision One sends to merchants include a legend stating that they are "legally privileged," although none of Decision One's communications in fact is legally privileged, as none of its representatives is an attorney.

42.     In a further deception, Decision One's callers encourage merchants to believe Decision One will begin negotiating on their behalf as soon as Decision One receives its first payment from the merchant.  In reality, Decision One typically does not lift a finger for merchants until they have paid it for months, or longer.  Usually a merchant has to pay Decision One $1,500.00 for the Veritas insurance and an amount equal to 33% of its total debt before

Decision One will begin to negotiate the merchant's debt.  Its expectation and intent is that merchants will drop out of the program before it has to do anything on their behalf.

43.     In a further deception, Decision One prepares a "Letter of Business Financial Hardship" to creditors for each merchant and has the merchant sign it.  The letters state that the merchant cannot afford to perform under its Merchant Cash Advance Agreement, and Decision One informs the merchant that it will be relied upon by creditors.  In fact, these letters do not state legal grounds for a merchant to stop payment, and have no effect on the Merchant Cash Advance Providers that receive them, who need to see verifiable facts about the merchant's actual sales and collections, not generalities written in a form created by Decision One.  The letters deceive the merchants into believing that they may legally stop making payments and Decision One will protect them.

44.     In a further deception, Decision One and Veritas represent to merchants that Veritas is an insurance program that is prepared and authorized to pay for their legal expenses in the event of litigation with their Merchant Cash Advance Providers.  Actually, Veritas is not licensed as an insurer or insurance broker in Florida or a number of other states where Decision One has induced merchants to join its plan, including California and Ohio.  Indeed, Veritas entered into a consent order with the Florida Office of Insurance Regulation, which found that Veritas "was acting as a legal expense insurer without a certificate of authority," and in which Veritas agreed to "cease and desist from engaging in the activities of a legal expense insurer in the state of Florida."  Consent Order, *In the Matter of: Veritas Legal Plan, Inc.*, Florida Office of Insurance Regulation, Case No. 167043-15, March 29, 2016.  Despite the Consent Order in Florida and its lack of authorization in other states, Veritas has continued to sell legal expense

insurance around the country from its offices in Florida.  The merchants end up paying substantial fees to Veritas for a service Veritas cannot lawfully deliver.

45.     Recently, after a New York court held that Higbee cannot practice in New York because its "New York" attorney does not have a bona fide office in New York (as required by a New York statute), *see Platinum Rapid Funding Group, Ltd. v. H D W of Raleigh, Inc.*, Index No. 605890/2017 (Supreme Court, Nassau County, December 29, 2017), Higbee simply stopped representing its merchant clients in lawsuits against Plaintiff in which that attorney had appeared, leaving them without representation.

46.     Veritas knows how the debt relief business works and how unlikely it is to deliver anything other than loss and liability to merchants. Veritas's founder, Angelo Anzalone, was an owner of Active Debt Solutions, a Florida-based consumer debt relief company that was fined $30,000.00 by the Attorney General of West Virginia, which resulted in the closing of the company.  The knowing connivance of Anzalone and Veritas in the operation of the Decision One Enterprise is a vital component of its continuing operation, as it enables Decision One to sell "debt relief" to merchants who might otherwise pay their debt.

47.     Decision One has a close and well-defined relationship with Veritas.  The Veritas Legal Plan Services Plan is part of the Debt Resolution Agreement with merchants.  It lays out the insurance plan, which requires the merchant's signature.  Decision One's logo appears on the first page of the Veritas Legal Plan Service Plan.

48.     Decision One also has a close relationship with D1 Servicing, which, on information and belief, is under common ownership with it and has common personnel with it. Despite the difference in their names, the two companies offer exactly the same services to merchants, and use exactly the same advertising video.  On information and belief, Decision One

recently transferred a significant part of its operations to D1 Servicing.  D1 Servicing is a mere

alter ego of Decision One.

49.     Additionally, Decision One uses multiple d/b/a's, each with its own Internet site,

but, on information belief, with no legal or operational differences between them.  These faces of

Decision One include SettleMyAdvance.com, BizDebtRestructuring.com,

SettleMyBusinessDebts.com, BizCorpDebtRestructuring.com, and

AffordableDebtSolutions.com.  Each website lists one of two contact telephone numbers that

both ring to Decision One, and those that list an address list Decision One's address in

Oklahoma.  Some of these websites represent that the company has a Better Business Bureau

"A+" rating, but, in fact, Decision One has an "F" rating.

### C.     Defendants' Deception of and Interference with Plaintiff's Merchants

50.     Many merchants with agreements with Plaintiff have succumbed to Decision

One's blandishments, and lived to see their debt to Plaintiff increase, with no benefit (indeed,

only detriment) for the payments made to Decision One and Veritas.  The interstate calls, emails

and mailed correspondence between Decision One and those merchants form a pattern of wire

and mail fraud that has continued for over a year and shows no sign of abating.

### i.     LIFE

51.     For example, L.I.F.E. Lasting Income for the Elderly ("LIFE"), a California

company, received its second cash advance from Plaintiff in early 2017.  LIFE made its

payments for two months, until, in early or mid-May 2017, its principal, Lillian Bruce, received a

postcard from Decision One, and shortly afterwards was put into contact with Decision One

representative Zinicola.  Zinicola presented Bruce with a sales pitch, including a deceptive video

transmitted by email on May 17, 2017, setting forth her supposed "options" relative to her

obligation to Funding Metrics.  In these communications, Zinicola and Decision One urged Bruce to close LIFE's bank account, open a new one, and change its accounting software – a recommendation clearly intended to encourage her to frustrate collection efforts by concealing or destroying data, and which intentionally misled her regarding her lawful rights and options, for the purpose of getting her to engage and pay Decision One instead of Plaintiff.  To reassure her, Zinicola also told her she would have access through Veritas to lawyers located in Utah and Florida to deal with the legal fallout.  On Decision One's request, Bruce transmitted information about LIFE to Decision One via email.

52.     On May 17, 2017, Bruce received from Decision One's Zinicola, also via email, a notification that her application had been approved, with a link to a package of documents to sign.  Like other emails Decision One sends to merchants, it included a legend stating that it was a "legally privileged communication."  On May 18, 2017, Bruce executed a Limited Power of Attorney appointing Decision One as LIFE's agent.  She also signed a "Letter of Business Financial Hardship" in the form Decision One tendered, including the statement that she understood it would be relied upon by creditors.  Additionally, LIFE's Decision One/Veritas contract lays out the Veritas "plan"; requires LIFE to electrically sign the document and provide LIFE's business banking information; and lays out the "First Draft Date," "Enrollment Amount," and the "Monthly Draft," arranging for drafts of funds from LIFE that in actuality are the property of Plaintiff.

53.     LIFE made what amounted to its final payment to Plaintiff the same day it signed up with Decision One and Veritas, although it still owed over $50,000.  Four days later, following Decision One's advice, LIFE closed the bank account from which Plaintiff was authorized to debit funds, citing "fraud" as the basis for closing the account.   There had been no

fraud, however; LIFE was simply giving the standard excuse for closing the account that

Decision One encourages every merchant to use.  When Plaintiff reached out to Bruce on

May 24, 2017 about her cut-off of payments, she referred it to a Decision One "business debt

advocate" named Brock Hogan.  LIFE then made a payment of $2,682.09 to Decision One on

May 26, 2017 and began making monthly payments of $2,617.90 to it thereafter.  Veritas sent

her a "welcome" email on June 2, 2017.

54.     On June 27, 2017, Bruce received an email from Chavoyo, whose title at Decision

One is "Business Client Advocate," stating that he "wanted to reach out and let you know that

you still have Veritas as a part of your debt relief program.  There was a system error and

underwriting is fixing this."  It was more than seven months later, on January 12, 2018, that a

Decision One representative, Rey Ruiz, emailed Bruce to say Decision One was ready to start

negotiating "on at least one" of her accounts.  Subsequently, Bruce received a summons and

complaint arising from LIFE's default, and, on January 19, 2018, spoke to another Decision One

representative, Jesse Ross, about how to respond.  Ross promised to send her an email address to

which to forward the pleading, but when Ross did not promptly follow up, she contacted Veritas

directly.  Then, on January 24, 2018, Ross, by email, told Bruce to mail the complaint to a

Decision One office in Kansas, or send it by email or fax.  In the end, however, Decision One

achieved nothing for LIFE with respect to its obligation to Plaintiff.  Although Veritas's Castaldo

emailed Bruce on January 30, 2018 with contact information for an attorney who would handle

her dispute with a different merchant cash advance provider, Plaintiff was never contacted by a

Veritas representative nor a Veritas attorney on Bruce's behalf.  LIFE was out-of-pocket the fees

it had paid to Decision One and Veritas and exposed to additional penalties under its agreement

with Plaintiff, while Plaintiff suffered loss of business; loss of income; delays in collection; increased collection costs and attorney fees.

### ii.    MFM

55.    On August 16, 2017, Plaintiff provided cash advance funding to MFM, Inc., a California company. MFM made its payments for two months.  Then, in a call in early October 2017, a Decision One representative in New Jersey told Mark White, one of MFM's owners, that Decision One could reduce MFM's obligation by nearly half, to $56,350.00.  White was also told that Decision One would take action on MFM's behalf immediately after receiving its first payment, and that MFM should cut off Plaintiff's access to its bank account immediately and not respond to calls from Plaintiff.  On October 15, 2017, Carroll emailed White a proposed agreement with Decision One.  On October 16, 2017, White's partner, Suzy White, had another call with Decision One, again speaking to its representative Carroll.  They walked through the tax implications of Decision One's advice to close MFM's bank account, and Carroll advised White that MFM's breach of the merchant agreement with Plaintiff would not come up on a credit report.  They agreed that MFM would pay Decision One $5,345.11 per month for 18 months, rather than pay Plaintiff.

56.    Based on Decision One's advice, MFM made what amounted to its final payment to Plaintiff on October 16, 2017, closed the bank account from which Plaintiff had been paid, and paid Decision One and Veritas instead.  At about the same time, Decision One mailed its "Welcome Package," including the Veritas agreement, to MFM.  Plaintiff retained an asset recovery firm which reached out to MFM, and on October 24, 2017 – as advised by Decision One, and instead of responding to Plaintiff – MFM emailed that communication to Decision One. On November 1, 2017, Plaintiff filed MFM's confession of judgment in a New York court and

obtained a judgment.  On November 14, 2017, MFM also signed an application to Veritas and transmitted it via email.  But in the months that followed, Decision One did nothing for MFM except to suggest that if MFM could pull together funds for a large lump sum payment to Plaintiff, its obligation might be settled.  Plaintiff had in fact said nothing to encourage such a "solution," which, in any event, was no solution, as MFM did not have a large lump sum available.

57.     Eventually, MFM fired Decision One and Veritas, and retained counsel at its own expense to deal with the judgment by confession.  MFM was out-of-pocket the fees it had paid to Decision One and exposed to additional penalties under its agreement with Plaintiff, while Plaintiff suffered loss of business; loss of income; delays in collection; increased collection costs and attorney fees.

### iii.     Junior

58.     On September 14, 2017, Plaintiff provided cash advance funding to Junior G.E.T. Enrichment Center ("Junior"), a day-care center located in Ohio.  For the next six weeks, Junior made its daily payments.  Then, with permission from Plaintiff, it reduced the amount it was paying.  But in early November 2017, Junior's principal, Janis Bond, spoke to a Decision One representative who told her Decision One could "consolidate" Junior's obligations and save it substantial money.  They told her that her funders would negotiate with Decision One and that she should forward any communications from Plaintiff to Decision One.  They also advised her to close the bank account from which Plaintiff was debiting and open a new account, a diversion of Plaintiff's funds.

59.     Bond agreed to pay Decision One $883 a month and pay a $1,500 down-payment to Veritas, and she gave Decision One a power of attorney dated November 14, 2017, closing her

bank account and stopping payment to Plaintiff the same day.  In doing so, she followed the advice of Decision One's Raymond Ciervo, transmitted via email on November 14, 2017, to open a new account at once so Junior would "not have any more funds withdrawn."  On November 17, 2017, Bond forwarded a communication from Plaintiff regarding her debt to Decision One, and Decision One's Matthew Frank responded that it was "not an official document that holds any merits, as it was not filed and executed through the courts" – meaningless advice, but clearly calculated to reassure Bond that she could legally repudiate her obligations to Plaintiff.   For the same purpose, on November 29, 2017, responding to another Bond inquiry regarding payment demands, Decision One's Steven Scorsone emailed to advise her to "just ignore them."  On January 16, 2018, Decision One's Mario Chavoyo emailed exactly the same wrong and misleading advice to Bond in response to another worried inquiry she made. But Decision One was doing nothing, intended to do nothing, and could do nothing to help Junior and validate its unsound advice.

60.     On December 1, 2017, Junior received Decision One's "welcome package" via email, and Smith sent her a welcome email on behalf of Veritas.  Bond then contacted Veritas for legal advice on collection efforts by Plaintiff.  Veritas told her to talk to Decision One, although Decision One is not a law firm. Decision One then informed Bond that it could not represent Junior because of litigation in Ohio.  Although Decision One gave Junior a refund, Veritas kept the $1,500 it had received.  Decision One and Veritas induced Junior to default on its obligation to Plaintiff, causing it to incur penalties, and providing no competent advice or legal assistance, while Plaintiff suffered loss of business; loss of income; delays in collection; increased collection costs and attorney fees.

### iv.    Your House

61.    Another merchant who fell victim to the scheme was Your House and Home Management, Inc. ("Your House"), a Florida-based home maintenance and management company owned and run by Mike Plocki.  In contrast to LIFE, MFM and Junior, Your House was already behind on its payments to Plaintiff when Plocki first spoke to Decision One, but Plocki always intended to make good on his obligation when he could.  Then, on November 15, 2017, in a call with Raymond Ciervo of Decision One, Plocki heard the usual sales pitch: Decision One would save him a lot of money if he started paying it, changed his bank accounts to cut off Plaintiff, and did not communicate with Plaintiff, and Decision One would go to work for Your House right away.  Persuaded, Plocki signed up, exchanging a series of emails with Ciervo on November 22, 2017.  Over the following months Your House paid Decision One approximately $10,000 while not paying Plaintiff.  However, Decision One never accomplished anything for Your House, which went into bankruptcy.  Your House was out-of-pocket $10,000, with no benefit, while Plaintiff suffered loss of business; loss of income; delays in collection; increased collections costs; and attorney fees.

62.    In addition to LIFE, MFM, Junior, and Your House, upwards of 25 other merchants have defaulted on their agreements with Plaintiff that have been represented by Decision One, under circumstances that compel the conclusion that the merchants defaulted because of Decision One's fraudulent interstate communications inducing it to do so. Collectively, these merchants owe Plaintiff over $1,000,000, which Plaintiff either will never collect, or will collect only in part and after delay and added collection expense caused by Decision One.

### D.      Injury to Plaintiff Caused by Defendants' Tortious Conduct

63.      The merchants' breaches of their Merchant Cash Advance Agreements have caused tremendous harm (and threaten continued harm) to Plaintiff.  Because of the breaches, Plaintiff has been unable to collect a substantial amount of the receivables to which it is entitled under the merchant agreements, which has resulted in a loss of business as well as loss of income.  Plaintiff has also incurred a delay in collections, greater collection costs and legal fees pursuing these receivables.

64.      Plaintiff also faces irreparable harm as a result of Defendants' conversion of funds in which Plaintiff had a security interest. Without the ability to debit funds due directly from those merchants' bank accounts, Plaintiff will likely never be able to collect from them.  At best, Plaintiff will accomplish these collections at greatly increased cost due to the expense of litigation with the merchants.

65.      Plaintiff is also faced with considerable business uncertainty caused by the seemingly endless pattern of repeated tortious conduct to which they are being subjected; with delay and distraction; with disruption of its relationships with its merchants; and with reputational harm.

### FIRST COUNT
### (Violation of 18 U.S.C. § 1962(c), by All Defendants)

66.      Plaintiff repeats and realleges paragraphs 1 through 65 of the Complaint, as if fully set forth herein.

67.      Decision One and its chief executive officer, John Sandoval, Veritas and its founder, Angelo Anzalone, form an association-in-fact enterprise (the "Decision One Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

68.     The enterprise is structured through the management of Decision One by Sandoval and of Veritas by Anzalone, and the agreements of Decision One, Veritas and Higbee to play their respective roles in its operations, with Decision One recruiting merchants customers, Veritas providing putative legal "insurance" to give the merchants an illusion of security, and Higbee putatively serving as counsel if a merchant is sued and Higbee is able to practice in the relevant jurisdiction. Each of the other individual Defendants participates in the operation and management of the Decision One Enterprise by emailing, mailing and/or calling merchants to persuade them to sign up and/or to keep of the appearance that they will eventually receive service.

69.     Defendants have conducted the affairs of the Decision One Enterprise through a pattern of racketeering activity. Such activity consists of predicate acts of mail and wire fraud, including Decision One's calls, emails and mailed correspondence with 29 of Plaintiff's merchants, including LIFE, MFM, Junior, and Your House.

70.     Each of these acts has been performed in interstate commerce.

71.     These acts have occurred for over one year and are likely to continue.

72.     Plaintiff has been damaged in its business and property as a result of Defendants' acts of wire and mail fraud. It has lost over a million dollars in collections from merchants induced by Decision One's deceptive promises to repudiate their obligations to Plaintiff.

**SECOND COUNT**
**(Violation of Fla. Stat. § 895.03(3), by All Defendants)**

73.     Plaintiff repeats and realleges paragraphs 1 through 65 of the Complaint, as if fully set forth herein.

74.     Decision One and its chief executive officer, John Sandoval, Veritas and its founder, Angelo Anzalone, form an enterprise (the "Decision One Enterprise") within the meaning of Fla. Stat. § 895.02(5).

75.     The enterprise is structured through the management of Decision One by Sandoval and of Veritas by Anzalone, and the agreements of Decision One, Veritas and Higbee to play their respective roles in its operations, with Decision One recruiting merchants customers, Veritas providing putative legal "insurance" to give the merchants an illusion of security, and Higbee putatively serving as counsel if a merchant is sued and Higbee is able to practice in the relevant jurisdiction.  Each of the other individual Defendants participates in the operation and management of the Decision One Enterprise by emailing and/or calling merchants to persuade them to sign up and/or to keep of the appearance that they will eventually receive service.

76.     Defendants have conducted the affairs of the Decision One Enterprise through a pattern of racketeering activity.  Such activity consists of predicate acts of mail and wire fraud, including Decision One's calls, emails and correspondence with 29 of Plaintiff's merchants, including LIFE, MFM, Junior, and Your House.

77.     These acts have occurred for over one year and are likely to continue.

78.     Plaintiff has been damaged in its business and property as a result of Defendants' acts of wire and mail fraud.  It has lost over a million dollars in collections from merchants induced by Decision One's deceptive promises to repudiate their obligations to Plaintiff.

**THIRD COUNT**
**(Tortious Interference with Contract, by the Decision One Defendants)**

79.     Plaintiff repeats and realleges paragraphs 1 through 65 of the Complaint, as if fully set forth herein.

80.     Plaintiff and each of the 29 merchants had valid and enforceable contracts under which Plaintiff performed.

81.     The Decision One Defendants knew of these contracts.

82.     The Decision One Defendants induced each of the merchants to breach its contract by representing to them that it could achieve significant savings if they paid it instead of paying Plaintiff.  The Decision One Defendants' statements were the proximate cause of such breaches.

83.     The Decision One Defendants' inducement of the merchant's breaches was without justification.

84.     Plaintiff has incurred damages and suffered other injuries as a result of the contractual breaches.

85.     Plaintiff has no adequate remedy at law.

## FOURTH COUNT
### (Conspiracy for Tortious Interference with Contract, by All Defendants)

86.     Plaintiff repeats and realleges paragraphs 1 through 65 of its Complaint, as if fully set forth herein.

87.     Plaintiff and each of the 29 merchants had valid and enforceable contracts under which Plaintiff performed.

88.     The Decision One Defendants knew of these contracts.

89.     Defendants agreed to combine for the common purpose of interfering with Plaintiff's contracts with merchants.

90.     The Decision One Defendants induced each of the 29 merchants to breach its contract by representing to them that it could achieve significant savings if they paid it instead of

paying Plaintiff.  The Decision One Defendants' statements were the proximate cause of such breaches.

91.     The Decision One Defendants' inducement of the merchant's breaches was without justification.

92.     Veritas, Angelo Anzalone, Sara Anzalone, Castaldo and Smith furthered and facilitated the Decision One Defendants' tortious interference with Plaintiff's contracts with the merchants by permitting the Decision One Defendants to represent to merchants that Veritas would provide them with insurance against legal expenses, and by providing such putative insurance.

93.     Plaintiff has incurred damages and suffered other injuries as a result of the contractual breaches.

94.     Plaintiff has no adequate remedy at law.

**FIFTH COUNT**
**(Conversion, by Decision One, Decision One Servicing, and Veritas)**

95.     Plaintiff repeats and realleges paragraphs 1 through 65 of its Complaint, as if fully set forth herein.

96.     Plaintiff had perfected security interests in the Merchants' property, which includes their inventory, accounts receivable, and the proceeds of such inventory and receivables in their bank accounts.

97.     The Merchants defaulted on their agreements with Plaintiff by failing to pay Plaintiff when able and/or by cutting off Plaintiff's access to the Merchants' bank accounts, as Defendants counsel merchants to do.

98.     Upon the Merchants' defaults, under the applicable merchant agreements, the "Specified Percentage" of the Merchants' receivables payable to Plaintiff increased to 100

percent (up to the "Purchased Amount"), which exceeded the funds in a number of Merchants' bank accounts.  At that point, Plaintiff was entitled to debit all funds in the bank accounts, and such funds were property in which Plaintiff had a right superior to that of any third party, including Defendants.

99.    Decision One, Decision One Servicing, and Veritas debited funds from the Merchants' bank accounts, despite Plaintiff's superior property rights.  In so doing, Decision One, Decision One Servicing, and Veritas improperly took possession and control of the funds in those accounts.

100.    By taking possession and control of the funds in the Merchants' bank accounts, Decision One, Decision One Servicing, and Veritas prevented Plaintiff from exercising their rights to those funds.

101.    Plaintiff did not authorize Decision One, Decision One Servicing, and Veritas to withdraw funds from the Merchants' accounts.  Further, under the circumstances, it would be futile for Plaintiffs to demand that Decision One, Decision One Servicing, and Veritas deliver the funds to Plaintiffs.

102.    Plaintiff is entitled to the return of such funds.

103.    Plaintiff is entitled to relief to prevent Decision One, Decision One Servicing, and Veritas from taking further funds from additional merchants.

**SIXTH COUNT**
**(Fraudulent Transfer, by Decision One, Decision One Servicing, and Veritas)**

104.    Plaintiff repeats and realleges paragraphs 1 through 65 of its Complaint, as if fully set forth herein.

105.    Under New York's Debtor & Creditor Law § 273-a, "[e]very conveyance made without fair consideration when the person making it is a defendant in an action for money

damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment."

106. Debtor & Creditor Law § 273-a applies to claims for fraudulent transfers in response to a New York judgment.

107. Plaintiff obtained a judgment in the Supreme Court of the State of New York, County of Westchester, against Your House and Home Management, Inc, and Michael Plocki when Your House defaulted under its merchant agreement. That judgment, which was entered on April 14, 2017, has not been satisfied.

108. Your House transferred funds to Decision One, Decision One Servicing, and Veritas after the judgment was entered against it.

109. The transfer was without fair consideration because Decision One, Decision One Servicing, and Veritas provided no services to Your House. Additionally, the transfer was made with actual intent to hinder or delay collection by Plaintiff.

110. Plaintiff is entitled to the return by Decision One, Decision One Servicing, and Veritas of the funds fraudulently transferred to them.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully requests that the Court enter judgment on the Complaint as follows:

On Plaintiff's First Count, for violation of the Racketeer Influenced and Corrupt Organizations Act: an award against all Defendants, jointly and severally, of compensatory damages in an amount to be determined at trial, trebled, together with pre-judgment and post-judgment interest and all costs;

On Plaintiff's Second Count, for violation of the Florida Racketeer Influenced and Corrupt Organizations Act: an award against all Defendants, jointly and severally, of forfeiture of the proceeds of Defendants' violations, in an amount to be determined at trial, together with pre-judgment and post-judgment interest and all costs;

On Plaintiff's Third Count, for Tortious Interference with Contract: an award against the Decision One Defendants of compensatory damages in an amount to be determined at trial, together with pre-judgment and post-judgment interest and all costs;

On Plaintiff's Fourth Count, for Conspiracy for Tortious Interference with Contract: an award against Defendants, jointly and severally, of compensatory damages in an amount to be determined at trial, together with pre-judgment and post-judgment interest and all costs;

On Plaintiff's Fifth Count, for Conversion: an award against Decision One, Decision One Servicing, and Veritas, jointly and severally, of compensatory damages in an amount to be determined at trial, together with pre-judgment and post-judgment interest and all costs;

On Plaintiff's Sixth Count, for Fraudulent Transfer: an award against Decision One, Decision One Servicing, and Veritas, jointly and severally, of compensatory damages in an amount to be determined at trial, together with pre-judgment and post-judgment interest and all costs;

Punitive damages against all Defendants in an amount to be determined at trial; and Injunctive relief to bar Defendants from doing any of the following:

(1) further debiting the bank accounts of any merchants with whom Plaintiff entered into contracts, known to Defendants or who should be known to Defendants, under which Plaintiff had a perfected security interest;

(2) further inducing or abetting breaches by the merchants of those agreements;

 (3) inducing additional merchants, known by or who should be known by Defendants to have entered into agreements with Plaintiff, to breach those agreements, including by inducing merchants to:

  (a) discontinue making payments due under their agreements with Plaintiff and to cease all contact with Plaintiff;

  (b) permit Defendants, to debit the accounts of such merchants where Plaintiff have perfected security interest in those accounts; and

For such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 10, 2018     Respectfully submitted,
     Boca Raton, Florida

              */s/ Matthew Triggs*
              Matthew Triggs
              Florida Bar No. 0865745
              Matthew I. Rochman
              Florida Bar No. 84615
              PROSKAUER ROSE LLP
              2255 Glades Road, Suite 421 Atrium
              Boca Raton, FL 33431-7360
              Telephone: (561) 241-7400
              Facsimile: (561) 241-7145
              mtriggs@proskauer.com
              mrochman@proskauer.com
              florida.litigation@proskauer.com

              David A. Picon (*pro hac vice* pending)
              Matthew J. Morris (*pro hac vice* pending)
              PROSKAUER ROSE LLP
              Eleven Times Square
              New York, NY 10036-8299
              Telephone: (212) 969-3000
              Facsimile: (212) 969-2900
              dpicon@proskauer.com
              mmorris@proskauer.com

              *Attorneys for Plaintiff Funding Metrics, LLC*