# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 18-81061-CIV-ALTMAN/Brannon

**FUNDING METRICS, LLC**,

     Plaintiff,

v.

**DECISION ONE DEBT RELIEF LLC; D1
SERVICING GROUP, LLC; VERITAS
LEGAL PLAN, INC.; ANGELO ANZALONE;
VICTOR CASTALDO; JOHN
SANDOVAL; and STEVEN SCORSONE**,

     Defendants.

_____/

## OMNIBUS ORDER

**THIS MATTER** comes before the Court upon (1) the Motion to Dismiss [the] Amended Complaint ("MTD"), filed by Decision One Debt Relief, LLC ("DDR"), and John Sandoval ("Sandoval") on April 8, 2019 [ECF No. 87][1]; (2) D1 Servicing Group, LLC's ("D1") Motion to Join Motion to Dismiss ("Mot. Join"), filed on June 18, 2019 [ECF No. 112][2]; and (3) D1's Motion to Set Aside Clerk's Default ("Mot. Set Aside"), filed on June 21, 2019 [ECF No. 120].[3] The Court held a hearing on these motions on June 24, 2019, at which the parties presented their oral arguments. The Court has carefully considered the parties' briefing, the arguments of counsel, and the applicable law.

---

[1] The Plaintiff filed its Response ("MTD Resp.") on April 26, 2019 [ECF No. 96], and DDR & Sandoval filed their Reply ("MTD Reply") on May 3, 2019 [ECF No. 99].
[2] The Plaintiff filed a Response on June 21, 2019 [ECF No. 117].
[3] The Plaintiff filed a Response ("Mot. Set Aside Resp.") on July 3, 2019 [ECF No. 131].

# I.    THE LAW

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (alteration added) (citing *Twombly*, 550 U.S. at 556). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012).

It is likewise well-established that, on a motion to dismiss, the Court must construe the complaint in the light most favorable to the plaintiff and accept the plaintiff's factual allegations as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)). But unsupported factual allegations and legal conclusions receive no such deference. *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

# II.    THE FACTS

The Amended Complaint contains four counts: (1) Count I alleges a violation of 18 U.S.C. § 1962(c) ("RICO") against all of the Defendants; (2) Count II raises a tortious interference claim against DDR and Sandoval; (3) Count III levies a conversion claim against DDR and Sandoval;

and (4) Count IV, relying on New York law, alleges that DDR and Veritas Legal Plan, Inc. ("Veritas") accepted a "fraudulent conveyance." *See generally* Am. Compl. [ECF No. 75].

The Plaintiff, Funding Metrics, LLC ("FM"), provides "cash advance funding" to merchants, many of whom are small businesses. Am. Compl. ¶¶ 2, 22-28.[4] FM also enters into separate security agreements with the merchants, by which FM acquires a security interest in the merchants' receivables, inventory, and other assets. Am. Compl. ¶¶ 25-26. DDR, on the other hand, "presents itself as being able to renegotiate and restructure merchant agreements with FM." *Id.* ¶ 2. FM describes DDR as a "debt relief" company that "persuades merchants to stop paying their cash advance funders based on its representations that DDR will negotiate a reduction in their obligations." MTD Resp. at 4 (citing Am. Compl. ¶¶ 2-3, 29-41). Sandoval is the founder and CEO of DDR. Am. Compl. ¶ 18.

FM contends that DDR induces merchants, by mail and e-mail, to "stop paying their cash advance providers and [to] pay DDR instead, based on representations that DDR will provide the merchants with negotiation services and [that] Veritas will defend them." MTD Resp. at 5 (citing Am. Compl. ¶¶ 2-8, 37-43). According to the Amended Complaint, DDR induced 30 of FM's merchant-clients to breach their contracts with FM—resulting in losses to FM of "over $1,000,000," as well as "injury to the merchants, who end up having paid DDR for nothing while getting deeper into debt to FM." MTD Resp. at 5 (citing Am. Compl. ¶¶ 27, 42, 77-78).

---

[4] FM has attached one such cash advance funding agreement as Exhibit 1 to its Amended Complaint. *See* [ECF No. 75-1].

# III.    ANALYSIS

## A.  Count 1: Civil RICO

To state a viable civil RICO claim, FM must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). In support of its attack on FM's RICO claim, DDR raises three principal arguments. First, it says the RICO claim is "unripe" because FM has not yet "foreclosed on [its] collateral" by suing the defaulting merchants. MTD at 8-9. Second, it contends that FM has not established the necessary degree of distinctness between the "persons" comprising the enterprise and the enterprise itself. MTD at 18. Third, it argues that FM cannot maintain its RICO claim against the Defendants because FM was not *directly* harmed by the Defendants' alleged fraud. MTD at 9-12.

DDR's first and second arguments should not long detain us. *First*, it is well-settled that a civil RICO claim may accrue "even when the amount of loss may be reduced by other lawsuits" because the "possibility of recovery on other claims affects the amount of RICO damages, not the accrual of the RICO claim." *See Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1350 (11th Cir. 2008). Accordingly, the Court rejects DDR's suggestion that FM's decision not to foreclose upon the merchants' collateral somehow precludes FM, as a matter of law, from pursuing a RICO claim against DDR directly. *Second*, the allegations in the Amended Complaint make clear that the alleged RICO enterprise consists of two separate corporate entities—DDR and Veritas—working together with two different individuals—Sandoval and Anzalone. Am. Compl. ¶¶ 1-11. Because the alleged enterprise is not merely between either DDR and its agents or Veritas and its agents, the purported enterprise does not, as DDR suggests, lack in distinctiveness. *See United States v. Goldin Indus., Inc.*, 219 F.3d 1268, 1270 (11th Cir. 2000) (finding that the plain language of § 1962(c) envisions two separate entities and requiring that each

defendant be separate and distinct from the "enterprise"). The Court therefore rejects DDR's second argument for the dismissal of FM's RICO claim.

On its third attempt, though, DDR hits its target. A civil RICO plaintiff must establish that the defendant's racketeering activity proximately caused his injuries. *See Beck v. Prupis*, 162 F.3d 1090, 1095 (11th Cir. 1998). And it is axiomatic that "proximate cause" requires a *direct* relationship between the "injury asserted and the injurious conduct alleged." *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992). In describing this "directness requirement," the Supreme Court has articulated the following three principles (the "*Holmes* principles") that lower courts should consider in evaluating the sufficiency of a RICO plaintiff's proximate-cause averments:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

*Holmes*, 503 U.S. at 269. At its core, then, *Holmes* stands for the proposition that "a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's [bad] acts [is] generally said to stand at too remote a distance to recover." *Id*. at 268-69.

Fourteen years after *Holmes*, the Supreme Court, in *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), adopted five "motivating principles"—principles the Eleventh Circuit has deployed as factors[5]—that animate this "directness requirement": (1) "the difficulty that can arise

---

[5] *See, e.g.*, *Corcel Corp. v. Ferguson Enterprises, Inc.*, 551 F. App'x 571, 576 (11th Cir. 2014).

when a court attempts to ascertain the damages caused by some remote action"; (2) "the speculative nature of the proceedings that would follow if [the plaintiff] were permitted to maintain its claim"; (3) "whether the alleged harm could have resulted from factors other than [the plaintiff's] alleged acts of fraud"; (4) "any appreciable risk of duplicative recoveries"; and (5) "whether the immediate victims of [the] alleged RICO violation can be expected to vindicate the laws by pursuing their own claims." *Anza*, 547 U.S. at 458-60 (cleaned up) (the "*Anza* factors").

For its part, the Eleventh Circuit has repeatedly employed either the five *Anza* factors or the three *Holmes* principles to dispose of civil RICO claims where, as here, the defendant's conduct did not *directly* cause the plaintiff's injuries. So, for example, in *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292 (11th Cir. 2003), the plaintiff argued that the defendants had engaged in RICO violations by "hid[ing] and falsif[ying]" evidence in several lawsuits around the country. Dismissing the RICO claim, the Eleventh Circuit held that the "directness inquiry is not a question of specific intent." *Id.* at 1307. Indeed, whether or not the defendants had specifically intended to obstruct justice or tamper with witnesses, the salient question, the court said, was whether the defendant's alleged pattern of racketeering activity had *directly* caused the plaintiff's injuries. *Id.* at 1308. *Accord Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898 (11th Cir. 1998) (dismissing shareholders' civil RICO claims against the company because the shareholder-plaintiffs were not the targets of the company's alleged pattern of racketeering activity); *Johnson Enterprises of Jacksonville, Inc. v. FPL Group*, 162 F.3d 1290 (11th Cir. 1998) (plaintiff could not assert a RICO claim based on fraudulent misrepresentations the defendant made to third parties); *Pelletier v. Zweifel*, 921 F.2d 1465 (11th Cir. 1991) (holding that, where the predicate acts supporting a civil RICO claim are mail or wire fraud, the plaintiff must have been a target of the scheme to defraud); *Allocco v. City of Coral Gables*, 221 F. Supp.

6

2d 1317 (S.D. Fla. 2002), *aff'd*, 88 F. App'x 380 (11th Cir. 2003) (same); *Halpin v. Crist*, 405 F. App'x 403, 406 (11th Cir. 2010) (rejecting civil RICO claims premised on defendants' scheme to defraud the Florida Department of Corrections because, although the scheme resulted in the plaintiff-prisoners paying more for certain goods, a RICO plaintiff "may not assert misrepresentations that were directed toward another person or entity, but [rather must] be the target of the scheme to defraud").

As in many of these cases, all of the *Anza* factors weigh strongly in DDR's favor here. Starting with the *first* and *third* factors—"the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action" and "whether the alleged harm could have resulted from factors other than [the plaintiff's] alleged acts of fraud"—no court could ever reliably conclude that it was DDR's conduct that *directly* caused FM's damages, because there are, with respect to each individual merchant, at least three other potential, intervening causes: viz. (1) the merchants' *independent* decision, in the first instance, to accept DDR's representations and to enter into contracts with DDR;[6] (2) the merchants' subsequent, *independent* decision to breach their contracts with FM;[7] and (3) the merchants' final, *independent* decision, after breaching, not to attempt to reconcile with FM by, among other things, settling with FM, either in full or at a discount, *see* Am. Compl. ¶¶ 42(f)-(g), 42(m) (averring that some of the merchants reached a separate agreement with FM to settle their contractual disputes "without the assistance of DDR negotiators"). Indeed, with or without DDR, some or all of the merchants may well have decided to breach their contractual obligations with FM *sua sponte*. By this same token, even merchants

---

[6] It is entirely likely, too, that some of the merchants might have withstood DDR's advances and, as such, decided not to enter into contracts with DDR. Indeed, it is reasonable to assume that something short of 100% of the merchants DDR approached actually signed a contract with DDR.
[7] Here, again, it is not unreasonable to assume that, even some of the merchants that did decide to enter into contracts with DDR, nevertheless elected not to breach their obligations to FM.

who knew or strongly suspected that DDR's statements were fraudulent might nevertheless have used the opportunity presented by DDR to cut ties with FM—either because they perceived FM's rates as usurious or for some other legitimate business reason. *Cf. Anza*, 547 U.S. at 459 ("Businesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of [FM's] lost sales were the product of [DDR's RICO violation]."). In any of these highly plausible scenarios, DDR's alleged RICO violations would have had no meaningful effect—that is to say, no *direct* effect—on FM's injuries. Because, in short, the merchants at all times retained the power either to remain with FM or, as the case may be, to breach, *their* intervening actions are precisely the sort of "independent factors" that, as *Anza* instructs, break the causal chain.

For this same reason, the *second Anza* factor—"the speculative nature of the proceedings that would follow if [the plaintiff] were permitted to maintain its claim"—redounds heavily to DDR's benefit. After all, whether, and to what extent, any or all of the merchants' intervening decisions contributed to FM's injuries—or whether, instead, FM's injuries were caused entirely by DDR's misrepresentations—is impossible (or, at least, very difficult) to say.

The *fourth* factor—the risk of "duplicative recoveries"—likewise supports dismissal. Whatever happens here, FM will retain the right to bring indisputably cognizable breach-of-contract claims against the merchants directly. Allowing it to proceed against DDR, also, leaves open the possibility that, when all is said and done, FM's RICO claims will have left it (unduly) enriched by "duplicative recoveries." Here, FM halfheartedly complains that some of these merchants may be insolvent. MTD Resp. at 7. And so they may be. But some others, as FM concedes, are not. *Id*. In either event, difficulties in collection do not render FM's double recoveries—once against the merchant and a second time against DDR—any less "duplicative."

The *fifth* and final *Anza* factor—"whether the immediate victims of [the] alleged RICO violation can be expected to vindicate the laws by pursuing their own claims"—similarly militates in favor of dismissal. The client-merchants are, in this case, the "immediate victim better situated to sue." *Bridge*, 553 U.S. at 658. And, as the *Anza* Court noted, "directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Id.* at 460 (cleaned up).[8]

Moreover, nothing in the Amended Complaint suggests that DDR's purported scheme specifically targeted FM. Instead, as relevant here, the Amended Complaint makes the following allegations: (1) the direct targets of DDR's fraudulent scheme were the merchants—not FM; (2) DDR only ever made false and fraudulent representations to the merchants—again, never to FM; and (3) all of the many calls, e-mails, and correspondence that, together, constitute the *sine qua non* of DDR's fraudulent scheme were, again, between DDR and the merchants—not FM. Am. Compl. ¶¶ 1, 3, 7, 9, 62. Notably, the Amended Complaint also includes no allegations that DDR's "pattern of racketeering activity" ever targeted, or was in any way intended to defraud, FM. *Cf.* Am. Compl. ¶ 3 ("The Merchants are in fact systematically defrauded . . . DDR has established a deceptive business practice of making misleading and often outright false representations to merchants . . . ."). To the contrary, the Amended Complaint makes plain that DDR "parasit[ically]" targeted, not just FM's merchant-clients, but also merchants who entered into cash advance agreements with other funders. *See* Am. Compl. ¶ 92. In short, DDR's fraudulent conduct was

---

[8] Nor does there appear to be any reason to "broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly." *Anza*, 547 U.S. at 460. After all, the Court's ruling here does not prevent FM from recovering, *in tort*, precisely what it has lost. *See* Section B, *infra*.

"aimed primarily at a third party"—the merchants—and not at FM. *Green Leaf Nursery*, 341 F.3d at 1307.

Against all this, FM says that *Holmes* and *Anza* have been substantially undermined by the Supreme Court's decision in *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). *Bridge*, in FM's view, stands for the proposition that a civil RICO plaintiff "need not be the sole, or even primary 'target' of fraud." MTD Resp. at 15. At oral argument, FM even suggested that *Bridge* somehow eliminated or significantly modified *Anza*'s "directness requirement." But *Bridge* did no such thing. Quite to the contrary, *Bridge* specifically adopted the "proximate-cause principles articulated in *Holmes* and *Anza*." *Bridge*, 553 U.S. at 657-58.

In fact, far from altering the Court's proximate-cause analysis, *Bridge* involved the entirely separate question of whether § 1962(c)—the statute at issue here—requires plaintiffs to "show that they relied on petitioners' fraudulent misrepresentations." *Bridge*, 553 U.S. at 648. At least two circuit courts of appeals—the Sixth and the Eleventh—had, over the years, read this "reliance" element into the statute.[9] In holding that § 1962(c) contains no such "reliance" element, the Court explained: "If petitioners' proposed requirement of first-party reliance seems to come out of nowhere, there is a reason: Nothing on the face of the relevant statutory provisions imposes such a requirement." *Id*. To the contrary, "[u]sing the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud, and hence a predicate act of racketeering under RICO, even if no one relied on any misrepresentation. And one can conduct the affairs of a qualifying enterprise through a pattern of such acts without anyone relying on a fraudulent misrepresentation." *Id*. (cleaned up).

---

[9] *Bridge* thus abrogated *Sikes v. Teleline, Inc.*, 281 F.3d 1350 (11th Cir. 2002), and *VanDenBroeck v. CommonPoint Mortgage Co.*, 210 F.3d 696 (6th Cir. 2000).

Having rejected the defendants' principal argument that § 1962(c) contains a reliance element, the Court turned to the defendants' alternative position—that "a plaintiff who brings such a claim must show that it relied on the defendant's misrepresentations in order to establish the requisite element of causation." *Id.* at 653. Here, the Court applied both the *Anza* factors and the *Holmes* principles to conclude that the plaintiffs had, in fact, established the requisite level of directness between the defendants' conduct and their own injuries. *Id.* at 654-60. In this respect, *Bridge*'s holding was narrowly tailored to the unique circumstances of that case, which differ materially from the facts alleged in the Amended Complaint—and which thus warrant brief attention here.

Every year, the Treasurer of Cook County, Illinois, held a public auction, at which it sold the tax liens the County had acquired against the properties of delinquent taxpayers. *Id.* at 642. Prospective buyers, like the plaintiffs and defendants in *Bridge*, bid on those liens—but not in cash. *Id.* Instead, the bids were put forward as a percentage of the penalties the property owners would have to pay the winning bidder to clear the liens. *Id.* A "bidder willing to accept the lowest penalty wins the auction and obtains the right to purchase the lien in exchange for paying the outstanding taxes on the property." *Id.* The property owner could then "redeem" his parcel by paying the lienholder the delinquent taxes. *Id.* Of course, if the property owner failed to pay, the lienholder could obtain a tax deed for the property, effectively purchasing the property for the value of the delinquent taxes. *Id.*

This system created two principal problems for the County. First, most of the delinquent properties would receive bids of zero percent, which then required the County to invoke a tiebreaking procedure. *Id.* To solve this first problem, Cook County initiated a "rotational" system that evenly allocated the tax liens to the universe of "winning," zero-percent bidders over time. *Id.*

at 643. But this equal apportionment system created a second problem: professional bidding enterprises could send multiple agents to the auction, each of whom would present zero-percent bids on the properties as if they were actually separate bidders. Because the "rotational" system was evenly allocated on the basis of the total number of bidders, the professional enterprises' scheme would result, over time, in those enterprises receiving a disproportionate share of the winning bids—that is, more bids than they would have won had they, like everyone else, propounded only one, zero-percent bid per property. *Id.* To remedy this second problem, the County instituted a "Single, Simultaneous Bidder Rule" that required each bidding entity to submit a bid only in its own name and which prohibited the use of "apparent agents, employees, or related entities" to place simultaneous bids for the same parcel. *Id.* The *Bridge* plaintiffs accused the defendants of violating the "Single, Simultaneous Bidder Rule" by falsely attesting to the County that certain firms were unrelated when, in truth, the firms were, on the defendants' behalf, bidding collusively on the tax liens. *Id.* at 644.

Quoting exclusively from *Holmes* and *Anza*, the Supreme Court laid out the legal standard it would apply to the defendants' proximate-cause argument:

> Proximate cause, we explained [in *Holmes*], is a flexible concept that does not lend itself to a black-letter rule that will dictate the result in every case. Instead, we use 'proximate cause' to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts with a particular emphasis on the "demand for some direct relation between the injury asserted and the injurious conduct alleged." *See also Anza*, *supra*, at 461 ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries"). The direct-relation requirement avoids the difficulties associated with attempting "to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors"; prevents courts from having "to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries"; and recognizes the fact that "directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any [] of the problems attendant upon suits by plaintiffs injured more remotely[.]"

*Id*. at 654-55 (cleaned up). Applying the *Anza* factors to the facts of that case, the Court had little difficulty finding that the plaintiff-respondents had sufficiently established a "direct financial injury":

> Respondents' alleged injury—the loss of valuable liens—is the direct result of petitioners' fraud. It was a foreseeable and natural consequence of petitioners' scheme to obtain more liens for themselves that other bidders would obtain fewer liens. And here, unlike in *Holmes* and *Anza*, there are *no independent factors that account for respondents' injury*, there is no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim is better situated to sue. Indeed, both the District Court and the Court of Appeals concluded that respondents and other losing bidders *were the only parties injured by petitioners' misrepresentations*.

*Id*. at 658 (emphasis added).

The *Bridge* plaintiffs, then, satisfied each of the *Anza* factors. *First*, there was no "difficulty ascertain[ing] the [plaintiffs'] damages" because those damages could be easily calculated by subtracting the number of liens the plaintiffs actually received on zero-percent bids from the number of zero-percent liens they mathematically would have received had the defendants submitted, as they were required to do, only one bid per property.[10] *Second*, this calculation was in no way "speculative" because, whatever the plaintiffs' ultimate damages were, those damages did not need to be set off in any way by the possibility that other victims may have likewise recovered some portion of the defendants' unjust enrichment. *Third*, while the *Bridge* damages calculation may not have been simple, it was not, as here, muddled by the interposition of intervening causes or the presence of other victims in closer proximity to the RICO scheme. *Fourth*, there was no "appreciable risk of duplicative recoveries" because, unlike the merchants' breaches in this case, the *Bridge* scheme did not involve the wrongful acts of any third parties

---

[10] To complete the calculation, the plaintiffs would then have had to multiply the difference by the expected value of the liens they lost.

situated between the plaintiffs and the defendants. And *fifth*, for similar reasons, there were no other, more "immediate victims" who could be expected to vindicate the laws by pursuing their own claims." *Anza*, 547 U.S. at 458-60.

As to this last point, the Court rejected the defendants' suggestion that the County was a more "immediate" victim of the defendants' false attestations. *Bridge*, 553 U.S. at 658. And this makes sense. After all, under its "rotational" system, the County evenly allocated the total number of tax liens to the "winning," zero-percent bidders—a number unaltered by the fact that the defendants, by their fraud, received more liens than they deserved. In this very important respect, in other words, the *Bridge* plaintiffs—who, by virtue of the even apportionment system, would have received more of the liens but for the defendants' fraud—were *the only* victims of the defendants' scheme.

In each of these ways, in short, the *Bridge* damages calculation differed markedly from the computation that would be required in this case. As in *Anza*, but unlike in *Bridge*, the "cause of [FM's] asserted harms . . . is a set of actions [the merchants not honoring their contracts] entirely distinct from the alleged RICO violation [DDR's misrepresentations to the merchants]." *Anza*, 547 U.S. at 458. And, as in *Holmes*, DDR's alleged RICO violations are linked to FM's injuries "only through the [merchants'] inability to meet their financial obligations." *Id.*

*Bridge* does contain one further passage that, though FM does not cite to it, requires brief discussion here:

> The Restatement provision cited by petitioners . . . . provides only that the plaintiff's loss must be a foreseeable result of someone's reliance on the misrepresentation. It does not say that only those who rely on the misrepresentation can suffer a legally cognizable injury. And any such notion would be contradicted by the long line of cases in which courts have permitted a plaintiff directly injured by a fraudulent misrepresentation to recover even though it was a third party, and not the plaintiff, who relied on the defendant's misrepresentation. Indeed, so well established is the defendant's liability in such circumstances that the Restatement (Second) of Torts

> sets forth as a general principle that one who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances. As an illustration, the Restatement provides the example of a defendant who seeks to promote his own interests by telling a known falsehood to or about the plaintiff or his product. And the Restatement specifically recognizes a cause of action in favor of the injured party where the defendant defrauds another for the purpose of causing pecuniary harm to a third person.

*Bridge*, 553 U.S. at 566-67 (cleaned up).

But this passage articulates nothing more than the "general principle" that a third-party plaintiff may, under certain circumstances, sue for injuries that are proximately—that is, directly—caused by an intentional wrongdoer. What this passage does not suggest, however, is that a third-party plaintiff may, as a matter of course, sue for *any and all* injuries that may or may not have proximately flowed from the wrongdoer's conduct. To the contrary, as *Anza* and *Holmes* made clear, and as *Bridge* reiterated, RICO plaintiffs cannot proceed where, as here, "independent factors" break the causal chain. *Id.* at 658.

Moreover, when viewed in proper context, this passage from *Bridge*, unquestionably *dicta*, is not nearly as capacious as FM might suggest.[11] *See Gundy v. United States*, 139 S. Ct. 2116, 2139 (2019) (Gorsuch, J., dissenting) ("We sometimes chide people for treating judicial opinions as if they were statutes, divorcing a passing comment from its context, ignoring all that came before and after, and treating an isolated phrase as if it were controlling."). Even under the most permissive reading of the Amended Complaint, DDR's scheme did not have, as its "purpose," the "causing of pecuniary harm to" FM. In fact, FM concedes that DDR's targets were the merchants—not FM—and that DDR perpetrated its fraud against merchants associated with a "number of funding companies," only *one of which* was FM. Am. Compl. ¶ 2.

---

[11] Again, although FM does not rely on this passage at all, the Court addresses it anyway in the interest of completeness.

15

*Bridge*, in sum, does not replace the five-factor *Anza* test, call into question the *Holmes* principles, or otherwise abrogate the long line of Eleventh Circuit cases which have required, as a pre-requisite to a viable civil RICO claim, that the defendant's conduct *directly* cause the plaintiff's injuries. *See Inversiones y Procesadora Tropical INPROTSA, S.A. v. Del Monte Int'l GmbH*, 921 F.3d 1291, 1301 (11th Cir. 2019) (courts must follow a decision of a prior panel of the Eleventh Circuit even when a subsequent Supreme Court opinion weakens that decision); *accord Tobinick v. Novella*, 884 F.3d 1110, 1118 (11th Cir. 2018) (holding that courts are bound to follow a Supreme Court decision that undermines circuit precedent *to the point of abrogation*). Notably, the Eleventh Circuit has, since *Bridge*, continued to analyze RICO causation narrowly and to affirm the dismissal of civil RICO claims where, as here, the defendant's allegedly fraudulent scheme did not injure the plaintiff *directly*. *See Halpin*, 405 F. App'x at 406.

Accordingly, DDR's Motion to Dismiss Count I of the Amended Complaint with prejudice is **GRANTED**.

## B. Count II: Tortious Interference with Contract

Count II of the Amended Complaint makes a claim for tortious interference with contract against both DDR and Sandoval. To state a viable tortious interference claim, FM must show: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the contract's breach; (4) the absence of justification or privilege; and (5) damages resulting from the breach. *Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1321 (11th Cir. 1990).

Apparently conceding, at least at this stage of the proceedings, that FM has satisfied four of these five elements, DDR contends only that it was justified in "interfering with Plaintiff's contracts with its merchants." MTD Reply at 11. Sandoval, for his part, admits that FM has

adequately pled the elements of a tortious interference claim, but nevertheless argues that, unless the Court elects to pierce DDR's corporate veil, he cannot be held *individually* liable for any misconduct he allegedly committed as an officer of DDR. Both arguments are meritless.

Taking Sandoval's argument first, although an officer may not be held individually liable for acts or omissions pertaining to a corporation's management or policy, he is not "shielded from accountability" for his own tortious misconduct. *Special Purpose Accounts Receivable Co-op Corp. v. Prime One Capital Co.*, 125 F. Supp. 2d 1093, 1104–05 (S.D. Fla. 2000). "In fact, the opposite is true. Florida courts uniformly hold that if an officer, director, or agent commits or participates in a tort, whether or not his actions are by authority of the corporation or in furtherance of the corporate business, that individual will be liable to third persons injured by his actions, regardless of whether liability attaches to the corporation for the tort." *Id.* Here, the Amended Complaint alleges that Sandoval crafted DDR's fraudulent company policies, was the architect of DDR's RICO scheme, and trained the company's sales and customer service representatives to "lure merchants into the program." MTD Resp. at 20. In sum, because the Amended Complaint plainly alleges that Sandoval *himself* participated in the tortious conduct, he can be held individually liable for that conduct—with or without piercing the corporate veil.

DDR's suggestion that it had a "justification or privilege" to interfere with the cash advance agreements between FM and the merchants fares no better. As FM correctly notes, the "justification or privilege" element applies only where the alleged tortfeasor has a prior contractual agreement with, or legal interest in, the breaching party. MTD Resp. at 21 (citing *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1325-27 (11th Cir. 2004) (franchisor had privilege to interfere in affairs of franchisee)). But there are no allegations in the Amended Complaint (or in

DDR's response) to the effect that DDR had any such prior contractual agreements with, or interest in, the merchant-clients.

Accordingly, DDR and Sandoval's Motion to Dismiss Count II is **DENIED**.

## C. Count 3: Conversion

Conversion is an "act of dominion wrongfully asserted over another's property inconsistent with [its] ownership therein." *Warshall v. Price*, 629 So. 2d 903, 904 (Fla. 4th DCA 1993). "A lienholder is considered to be an 'owner' for the purposes of conversion if he has a present right of possession." *See Bel-Bel Int'l Corp. v. Cmty. Bank of Homestead*, 162 F.3d 1101, 1108 (11th Cir. 1998) (citations omitted). Florida courts have required a lienholder, like FM, to establish that a converter exercised its "wrongful" dominion over the property by way of a "positive, overt act or acts." *Black Bus. Inv. Fund of Cent. Fla., Inc. v. State, Dep't of Econ. Opportunity*, 178 So. 3d 931, 936 (Fla. 1st DCA 2015) (cleaned up). Moreover, to state a claim for the conversion of *money*, the plaintiff must identify a specific and segregated fund, which may include receivables in which the plaintiff has a property right. *Bel-Bel Int'l*, 162 F.3d at 1108.

Pointing to its cash advance and security agreements with the merchants, FM says that it had a "present right of possession" in "the accounts receivable and inventory and their proceeds, which constitute specific funds in which it has a property right superior to any right DDR could assert." Am. Compl. ¶ 26. And FM avers that DDR exercised wrongful dominion over specific funds of money by way of three distinct varieties of "positive, overt act or acts": (1) DDR unilaterally "debited funds from the Merchants' bank accounts despite FM's superior property rights," MTD at 22; *see also* Am. Compl. ¶ 99; (2) DDR directed merchants to create a new bank account through which it could re-route to DDR payments that were previously scheduled for FM,

*see* Am. Compl. ¶¶ 38, 70; and (3) DDR accepted voluntary payments from the merchants. MTD at 23 (citing Am. Compl. ¶¶ 5, 41-42, 66).

The first two varieties plainly describe DDR's unilateral diversion of specific receivables that, but for DDR's allegedly wrongful acts, would have ended up in FM's possession. *See also Special Purpose Accounts Receivable Co-op Corp.*, 125 F. Supp. 2d 1093 (analogizing *Bel-Bel* and finding that the plaintiff's conversion claims withstood the defendants' motion for summary judgment where, as here, the defendants interfered with, and exercised control over, the receivables of third-party debtors). As such, these allegations sufficiently state a claim for conversion.

But FM's reliance on *Bel-Bel* for the proposition that DDR's acceptance of voluntary payments from the defaulting merchants somehow constituted an "overt act" of wrongful dominion is misplaced. MTD Resp. at 24. *Bel-Bel* did not involve the mere acceptance by the defendant of funds paid into the defendant's bank account by a third party. Instead, as with the first two varieties of FM's allegations in this case, the defendant in *Bel-Bel* created a specific "lock-box account into which the receivables" at issue were diverted. *Id.* The plaintiff in *Bel-Bel* had a "present right of possession to the receivables"—a right over which the defendant wrongly "exercised control" by *unilaterally* diverting the funds through the lock-box account. *Id.* at 1108. Here, by contrast, FM's allegations with respect to the third variety of "overt act" make clear only that the merchants decided to pay DDR money they owed to FM. But these allegations fail to establish either that DDR unilaterally diverted these monies or that the monies derived from a specific fund of money—tantamount to a receivable—over which FM, and only FM, had a "present right of possession." Notably, FM cites no case—and the Court has found none—for the proposition that a defaulting third party's independent decision to withdraw money from its bank account and to make voluntary payments, not to the plaintiff, but to the defendant, somehow

constitutes an "overt act" asserting "wrongful dominion" over a specific fund of the plaintiff's money.

Accordingly, DDR's Motion to Dismiss Count III is **DENIED** as to the first two varieties of FM's conversion claims and **GRANTED** as to the third.

## D. Count IV: Fraudulent Transfer

In Count IV, the Amended Complaint asserts a claim against DDR and Veritas under New York's Debtor and Creditor Law, § 273-a—which, in pertinent part, provides as follows:

> Every conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment.

In New York, then, a debtor against whom judgment has been entered may not, subsequent to that judgment, convey funds to a third party unless the third party pays "fair consideration" for the "conveyance." *Id.*

FM alleges that it obtained a state court judgment in New York against Your House, a merchant-client who had defaulted on its contractual obligations to FM. Am. Compl. ¶ 107. FM says that, at some point after that judgment, Your House entered into a contract with DDR—as a result of which Your House began transferring funds to DDR. *Id.* ¶ 108. Finally, because DDR defrauded Your House, FM contends that DDR "took no action" on Your House's behalf—and that, as such, DDR never paid "fair consideration" for the "conveyance." MTD Resp. at 25.

DDR counters that it did pay *some* consideration to Your House. In support, it cites to a number of e-mails it exchanged with, and phone calls it made to, Your House's representatives. MTD Reply at 13. But, as DDR conceded at oral argument, the question of what constitutes "*fair consideration*" in practice "must be determined upon the facts and circumstances of each particular

case." *United States v. McCombs*, 30 F.3d 310, 326 (2d Cir. 1994). Because FM sufficiently alleges that Your House received no such "fair consideration" from DDR, DDR's Motion to Dismiss Count IV is **DENIED**.

### E. D1's Motion to Set Aside Default

A few days before the Court held a hearing on DDR's MTD—nearly ten full months after having been served with the complaint and five months after the Clerk of Court entered default against it—D1 entered an appearance in this case and then promptly filed a Motion to Join DDR's Motion to Dismiss [ECF No. 112]; a "Re-Notice of Joinder in the Motion to Dismiss" [ECF No. 119]; and a Motion to Set Aside Default [ECF No. 120].

D1 was properly and timely served with a copy of the complaint on August 20, 2018 [ECF No. 35]. D1 did not contest the adequacy of that service and never deigned to respond to the complaint. On January 30, 2019—over five months after D1 was served—FM filed, as to D1, a Motion for Clerk's Entry of Default [ECF No. 66]. On January 31, 2019, the Clerk granted that motion [ECF No. 67]. It was not until almost five months later that D1 found it appropriate to appear.

Under Federal Rule of Civil Procedure 55(c), a district court may set aside a clerk's default "for good cause shown." The Eleventh Circuit has explained that "good cause" is a "mutable standard, varying from situation to situation." *Compania Interamericana Export–Import, S.A. v. Compania Dominicana de Aviacion*, 88 F.3d 948, 951 (11th Cir. 1996). But, although "good cause" is "a liberal" standard, it is "not so elastic as to be devoid of substance." *Id*. In this respect, the Eleventh Circuit has instructed district courts to consider three factors in determining whether a party has established "good cause": (1) whether the default was culpable or willful; (2) whether setting aside the default would prejudice the adversary; and (3) whether the defaulting party

presents a meritorious defense. *Id.* Significantly, however, where a party "willfully defaults by displaying either an intentional or reckless disregard for the judicial proceedings, the court need make no other findings in denying relief." *Id.*

D1 "willfully default[ed]" in this case by "recklessly disregard[ing] th[ese] judicial proceedings." D1's Motion to Set Aside acknowledges that a Mr. Thomas Uva—whom D1 describes as a "Director of D1"—received proper service of the complaint in August 2018. Mot. Set Aside at 3. But, D1 says, Mr. Uva "did not understand that [the complaint] had any legal significance whatsoever." *Id.* Of course, Mr. Uva did not file a declaration attesting to any of this. Instead, D1's counsel has submitted a declaration signed by D1's "former owner," a Mr. Scarpaci, who speculates inappositely about what *he believes* Mr. Uva *thought* the summons meant [ECF No. 120-1]. This hearsay declaration proves absolutely nothing.

Moreover, the Court is entirely unmoved by counsel's protestations at oral argument that Mr. Uva—or, as the case may be, Mr. Scarpaci—should receive a pass because they are not lawyers. American summonses are written in plain and simple terms precisely so that the laypeople upon whom they are typically served can understand and respond to them. Indeed, the Court has reviewed the summonses in this case and concludes that no layperson, reviewing them in good faith, could have been in any way confused by their significance. *See, e.g.*, Scorsone Summons [ECF No. 17-1] (noting, in straightforward terms, that "a lawsuit has been filed against you)." And, even if the summons were somehow insufficient to put D1 on notice of its obligation to appear, FM served on D1 paper copies of its filings in this case *on at least nine different occasions* during the pendency of this litigation. Mot. Set Aside Resp. at 12 [ECF No. 131]. D1 does not even try to explain why it failed to act upon its receipt of any of these filings. Because, in short, the Court finds that D1's default was willful, the Court need not reach the remaining *Compania* factors. *See*

*Dunkin' Donuts Franchising, LLC v. Gulf to Bay Donuts, Inc.*, No. 8:10-CV-01087, 2010 WL 3276459, at *2 (M.D. Fla. Aug. 18, 2010) ("A willful default . . . is sufficient legal reason to deny the Defendants' motion [to set aside a default].").

In any event, as *both* FM and DDR explained at oral argument, any order setting aside the Clerk's default would significantly prejudice both parties. D1 filed its Motion to Set Aside just six business days before the close of all discovery. Although they agreed on little else, both DDR and FM concurred that D1's sudden appearance would require the Court to reopen discovery, allow additional depositions, permit the parties to retake some of the depositions they have already completed, grant the parties the time to propound supplemental requests for production and interrogatories, and enter lengthy extensions to each of the long-set deadlines in the Amended Scheduling Order [ECF No. 95]. And it is not unreasonable to assume, as FM suggested at the hearing, that the parties might have employed different strategies—or taken their discovery in a different order—had D1 been involved in this case from the beginning. Allowing D1 to enter this case, in other words, would instigate a parade of scheduling horribles that D1's willful disregard of its obligations—and its decision to appear only at the most prejudicial possible moment—does not come close to justifying.

*********

Accordingly, the Court hereby

**ORDERS AND ADJUDGES** as follows:

1. DDR's Motion to Dismiss [the] Amended Complaint [ECF No. 87] is **GRANTED in part and DENIED in part**. Count I is **DISMISSED with prejudice**.

2. D1's Motion to Set Aside Default [ECF No. 120] is **DENIED**.

3.  D1's Motions to Join Motion to Dismiss [ECF No. 112] and [ECF No. 119] are **DENIED as moot**.

4.  D1's Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Filing for Attorney David Graff is **DENIED as moot**.

    **DONE AND ORDERED** in Fort Lauderdale, Florida, this 8th day of August 2019.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record